UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MONTCLAIR UNITED SOCCER CLUB,

　　　　　　Plaintiff,

　　v.

COUNT ME IN CORP.; ARENA GROUP, INC.; and J. TERRENCE DRAYTON,

　　　　　　Defendants.

CASE NO. C08-1642-JCC

ORDER

This motion comes before the Court on cross motions for summary judgment: Plaintiff Montclair United Soccer Club's Amended Motion for Summary Judgment (Dkt. No. 45), Defendant J. Terrence Drayton's Response (Dkt. No. 51), and Plaintiff's Reply (Dkt. No. 55); and Defendant's Motion for Summary Judgment (Dkt. No. 36), Plaintiff's Response (Dkt. No. 49), and Defendant's Reply (Dkt. No. 57). The Court has carefully considered these documents, their supporting declarations and exhibits, and the balance of pertinent materials in the case file and has determined that oral argument is not necessary. The Court finds and rules as follows.

**I.　BACKGROUND**

Plaintiff Montclair United Soccer Club is a non-profit organization that sponsors recreational and competitive soccer programs for more than 1,600 children from Montclair, New Jersey, and surrounding communities. (Heisler Decl. ¶ 2 (Dkt. No. 33).) Plaintiff also sponsors soccer programs for

ORDER – 1

children with special needs and programs for the benefit of local parks and schools. (*Id.*) The organization is funded solely through registration fees and donations made on behalf of the children who participate in its programs. (*Id.*)

Defendant Count Me In Corporation ("CMI"), a Washington company based in Bellevue, describes itself as "the trusted online sports registration software for thousands of organizations, tens of thousands of activities, millions of registrations and hundreds of millions in payments." (Am. Compl. ¶ 10 (Dkt. No. 26).) On February 23, 2007, Plaintiff entered a Client Service Agreement with CMI pursuant to which CMI was to provide Plaintiff with online registration and payment services. (Client Service Agreement (Dkt. No. 34-4).) The Client Service Agreement required CMI to provide online registration and credit card payment processing services in exchange for transaction fees paid by Plaintiff. (Am. Compl. ¶ 12 (Dkt. No. 26).) The system worked roughly as follows: a registrant for one of Plaintiff's programs would be directed from Plaintiff's website to a website maintained by CMI. (*Id.* ¶ 13.) The registrant would then authorize CMI to charge his or her registration fee to a credit card number. (*Id.*) CMI would process the payment with the applicable credit card company, and the registrant would be charged by the credit card company for that amount. (*Id.*) The credit card company would deposit the authorized amount directly into CMI's bank account. (*Id.*) CMI was required, under the Client Service Agreement, to remit to Plaintiff twice a month the registration fees from Plaintiff's registrants, minus the agreed-upon transaction fees. (*Id.* ¶ 14.)

During the Spring, Summer, and Fall of 2008, Plaintiff's registrants paid more than $210,000 in fees and donations to Plaintiff using CMI's website. (*Id.* ¶ 15.) However, the remittances from CMI were not forthcoming. When Plaintiff's directors contacted CMI to inquire about the funds, they received responses from CMI's Founder and Chief Executive Officer, Defendant J. Terrence Drayton. On October 6, 2008, in response to an email from one of Plaintiff's directors asking for payment, Drayton sent a reply email stating, in pertinent part:

> These are challenging times and like many firms in the current credit crisis we are having

ORDER – 2

<blockquote>
cash flow problems. We have stabilized the situation and are working to address it as quickly as possible with a capital infusion. We are doing our best to get you the funds and will pay you as soon as we possibly can.

We are addressing all client remittances on a systematic basis and will remit the outstanding payments for Cycle's [sic] 13 through 15 that total $67,326.70 Thursday or worst case on Friday of this week. That will get Montclair United current to mid-August. We will also pay you the interest of 1.5% per month on any amounts we owe you until it is paid in full. . . .
</blockquote>

(10/6/08 Drayton Email (Dkt. No. 34-5 at 1).) The following day, Drayton sent an internal company email discussing CMI's remittance problems, in which Drayton explained to company employees that CMI's clients' funds and its own company funds had been commingled, and that client funds had paid for CMI's operating expenses. (10/7/08 Drayton Email (Dkt. No. 39-2 at 2).) In particular, client funds had been spent on developing a new software technology owned by CMI, referred to as "Rainier." (*Id*.) Although CMI eventually paid some of the owed remittances to Plaintiff, approximately $117,000 still remains unpaid. (Drayton Decl. ¶ 29 (Dkt. No. 37 at 14).)

On November 10, 2008, Plaintiff initiated this action, bringing claims against CMI for breach of contract, breach of good faith and fair dealing, conversion, unjust enrichment, and violation of Washington Revised Code section 19.86.020 for unfair and deceptive trade practices. (Compl. (Dkt. No. 1).) The Complaint also included conversion and unjust enrichment claims against Defendant Arena Group, Inc. ("Arena"), CMI's parent company. (*Id*.) At that time, Plaintiff made only one allegation against Drayton personally—that he had engaged in tortious interference with the Client Service Agreement. (*Id*.) Thereafter, however, this matter was stayed as to CMI and Arena pending resolution of Chapter 7 Bankruptcy proceedings in this district. (Mot. to Am. Compl. (Dkt. No. 21).) As a result, Plaintiff amended its Complaint to add claims against Drayton, including breach of contract, breach of good faith and fair dealing, violation of Washington's unfair and deceptive trade practices statute, conversion, and unjust enrichment. (Am. Compl. (Dkt. No. 26).) In addition, the Amended Complaint adds a claim against Drayton for fraudulent transfer of assets, based on Drayton's alleged transfer of property to his wife soon after the initiation of this lawsuit. (*Id*.)

ORDER – 3

Plaintiff now moves for partial summary judgment against Drayton on its claims for conversion, unjust enrichment, and deceptive trade practices. (Pl.'s Mot. 1 (Dkt. No. 45 at 5).) Plaintiff argues that Drayton should be held personally liable for these three causes of action, under the "responsible corporate officer" doctrine. (*Id*. at 17.) Defendant also moves for summary judgment on all of the claims against him personally. (Def.'s Mot. 1–2 (Dkt. No. 36).) Alternatively, Defendant asks that the Court order partial summary judgment on the claim of unjust enrichment and find that punitive damages are not available for the tortious interference with contract claim. The Court will address these issues, in turn, below.

## II. APPLICABLE LAW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The moving party bears the initial burden of showing that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the moving party meets this initial burden, then the party opposing the motion must set forth facts showing that there is a genuine issue for trial. *See T.W. Elec. Serv.*, 809 F.2d at 630. The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "In response to a summary judgment motion, . . . the [non-moving party] can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, . . . which for the purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); FED. R. CIV. P. 56(e). "The court must view all the evidence in the light most favorable to the nonmoving party." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

ORDER – 4

1 matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Where the moving party bears the ultimate burden of proof at trial, it must affirmatively put forth evidence that would satisfy its burden of proof at trial. STEPHEN S. GENSLER, FEDERAL RULES OF CIVIL PROCEDURE: RULES AND COMMENTARY 777 (2008). The nonmoving party can defeat summary judgment with fact assertions that create a genuine dispute as to any essential element of the moving party's claim. *Id*.

## III. ANALYSIS

### A. Defendant's Motion for Summary Judgment

#### 1. The Business Judgment Rule

Drayton first argues that he cannot be held personally liable to Plaintiff under any of the causes of action in Plaintiff's Amended Complaint because the business judgment rule shields him, as a corporate officer, from liability for management decisions that were made within his authority and in good faith. (Def.'s Mot. 15–21 (Dkt. No. 36).)

Washington courts "review business decisions under the business judgment rule and infrequently reverse a business decision." *Lane v. City of Seattle*, 194 P.3d 977, 979 (Wash. 2008). "Under the business judgment rule, corporate management is immunized from liability in a corporate transaction where (1) the decision to undertake the transaction is within the power of the corporation and the authority of management, and (2) there is a reasonable basis to indicate that the transaction was made in good faith." *McCormick v. Dunn & Black, P.S.*, 167 P.3d 610, 617 (Wash. Ct. App. 2007) (discussing the business judgment rule in the context of a shareholder's lawsuit for dissolution of the corporation); *see also Scott v. Trans-System, Inc.*, 64 P.3d 1, 5 (Wash. 2003) (same).

Plaintiff argues that the business judgment rule would not apply to Drayton because the rule insulates corporate officers only from liability to the corporation and its shareholders, not from harm caused to third parties. (Pl.'s Resp. 17 (Dkt. No. 49).) However, Plaintiff cites only an unreported New York case for this proposition. *See Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306 (SAS), 1999 WL

ORDER – 5

4892, at *4 (S.D.N.Y. Jan. 5, 1999). Plaintiff points to no authority to support the proposition that the business judgment rule is applied so narrowly in Washington. The Washington Supreme Court has said that the purpose of the business judgment rule "is to provide sufficient breathing space [to business executives] for making discretionary decisions, by preventing judicial second-guessing of such decisions through the medium of a tort action." *Zellmer v. Zellmer*, 188 P.3d 497, 503 (Wash. 2008). This purpose would appear to be served by applying the business judgment rule to tort actions by third parties.

Nonetheless, the Court is not persuaded that Drayton is entitled to summary judgment on the basis of the business judgment rule. In Washington, "a court will not substitute its judgment for that of corporate directors '[u]nless there is evidence of fraud, dishonesty, or incompetence (i.e., failure to exercise proper care, skill, and diligence)[.]'" *Riss v. Angel*, 934 P.2d 669, 681 (Wash. 1997). Mere "[g]ood faith is insufficient because a director must also act with such care as a reasonably prudent person in a like position would use under similar circumstances." *Id.*; *see also Shinn v. Thrust IV, Inc.*, 786 P.2d 285, 290 (Wash. Ct. App. 1990) (holding that to be protected by the business judgment rule a director must act with good faith and with such care as an ordinarily prudent person in a like position would use under similar circumstances).

The question, then, is whether there are no genuine issues of material fact as to whether Drayton acted in good faith and with proper care, skill, and diligence with regard to the corporate transactions relating to Plaintiff's unpaid remittances. Drayton asserts that he sought advice from CMI/Arena's corporate counsel and certified public accountant when setting up the businesses, and that none of his advisors "expressed any concern about paying operating costs out of the same account that held funds for remittance to clients." (Drayton Decl. ¶ 30 (Dkt. No. 37 at 15).) He claims that he "relied upon individuals with demonstrated skills and experience, such as the company's President, Joe Petrucci, and its Chief Financial Officer, Debi Nordstrom, to manage [CMI] and Arena." (Def.'s Mot. 18 (Dkt. No. 36).) Drayton asserts that he selected Nordstrom as CFO because she had been previously employed at one of his other companies and Drayton "believed she had the necessary knowledge and experience to

ORDER – 6

handle the complicated accounting issues." (Drayton Decl. ¶ 10 (Dkt. No. 37 at 5).) Drayton states also that Petrucci had been appointed as President of CMI because he had done a good job managing the business for many years and Drayton had faith in his ability to resolve problems. (*Id.* ¶ 17.)

However, Drayton's conclusory statements that he acted with good faith because he believed in Petrucci and Nordstrom's abilities are not enough to persuade the Court at this stage that he acted with the proper care, skill, and diligence in attempting to ensure that there was proper financial oversight.[1] Drayton has not submitted evidence of any meetings or discussions he had with these or other advisors in making the decisions to commingle the client and company funds and to use those commingled funds to pay for the company's overhead expenses. Instead, it appears from the record that Drayton, who was CEO of the company during the times pertinent to this lawsuit,[2] did not consider it his job to get involved in the "details" of the company's financial systems. (*See, e.g.*, 12/30/08 TechFlash Article (Dkt. No. 38-2) ("Asked how an experienced executive could operate a company for so long without basic accounting procedures in place, Drayton said that he's always been an innovator who focuses on the big

---

[1]Drayton himself acknowledges that CMI's inability to pay clients their remittances stemmed from a lack of proper financial oversight. He told a reporter in December 2008 that:

> How we got into this situation was not all that complicated. . . . We had some issues with people, we had some issues with systems, we had some issues with lack of financial oversight, and as a result we have a small deficit in the amount of money we have handled over the years. . . . At the heart of it, it is a lack of oversight more than anything else.

(12/30/08 TechFlash Article (Dkt. No. 38-2).)

[2]Drayton attempts to distance himself from the role of CEO, stating that for most of the pertinent time period, he was only a part-time Secretary for CMI and Arena, with responsibility for developing software. (Drayton Decl. ¶ 5 (Dkt. No. 37).) However, evidence shows that at least as of May 1, 2008, Drayton was the full-time CEO of CMI/Arena. (5/27/08 Drayton Email (Dkt. No. 41-6 at 1) ("Effective May 1, I became full time CEO for the first time in our 7 year history.").) Therefore, it appears that he was CEO during the times pertinent to Plaintiff's Amended Complaint, which focuses on unpaid remittances from Spring, Summer, and Fall of 2008. Further, Drayton does not dispute that he was an officer of the corporation from its inception. (Drayton Dep. 217:12–22 (Dkt. No. 41-4 at 78–79).)

ORDER – 7

picture. 'I suck at details,' he said."). Further, Nordstrom and Petrucci resigned in mid-October 2008. (Drayton Decl. ¶ 5 (Dkt. No. 37 at 3).) After that time, Drayton could not have relied upon their advice in deciding how to handle financial issues.

Moreover, Drayton appears to argue that he made a good faith business decision to use client funds to operate CMI because if CMI was forced to shut down, there would be no possibility for potential investors to bail the company out of debt. "[B]y continuing to operate, [CMI] gave itself the opportunity to secure funds to operate and pay remittances."[3] (Def.'s Mot. 20 (Dkt. No. 36); Drayton Decl. ¶ 34 (Dkt. No. 37) ("A small portion of funds for all [CMI] clients was withheld so we could continue operating as we tried to find investors and prospective purchasers.").) Plaintiff contends, however, that Drayton's decision to use Plaintiff's money, without Plaintiff's permission, to pay the operating expenses of CMI and Arena, companies in which Drayton is the largest investor, "is, stated plainly, theft." (Pl.'s Resp. 3 (Dkt. No. 49).) It is undisputed that the most significant operating expense paid for by client funds was an upgrade in the Rainier software technology, in which Drayton now has a substantial ownership interest, and from which he is generating an annual salary of $180,000.[4] (Drayton Dep. 139:15–20 (Dkt. No. 41-4 at 28).) The Court is not persuaded that Drayton's decision to use client funds to develop valuable technologies from which he stood to benefit is evidence of good faith.

Drayton also argues that his actions demonstrate his good faith because starting in October 2008, after "[m]anaging angry clients looking for their funds . . . [became] the primary job for the entire staff[,]" (Drayton Decl. ¶ 19 (Dkt. No. 37)), Drayton made deep staff reductions; he made changes to

---

[3] Drayton blames Plaintiff for filing this lawsuit and thereby allegedly scaring away investors, foreclosing any possibility that investors could bail the company out of debt and allow the company to pay Plaintiff its remittances in full. (*Id.*) The Court finds this reasoning both distasteful and unpersuasive. Drayton's blaming the victim for CMI's inability to remit the owed funds does not make the Court inclined to find that Drayton acted in good faith towards Plaintiff.

[4] Drayton owns approximately 10% of Ranier Software, Inc., the company that purchased the bankruptcy assets of CMI/Arena, for $200,000. (Pls.' Resp. 16 (Dkt. No. 49).)

ORDER – 8

business practices, including being candid in communications with clients about their remittances; he implemented policies limiting the financial exposure to CMI clients; and, ultimately, he decided to stop handling client funds altogether by mid-December 2008. (*Id.* ¶ 20.) However, Drayton admits that he was made aware of the company's remittance problems as early as the Spring or Summer of 2007. (Drayton Decl. ¶ 8 (Dkt. No. 37 at 4); Drayton Dep. 86:3–9 (Dkt. No. 41-4 at 22).) Yet he chose not to disclose these problems to clients until late 2008 because "[t]o disclose the balance sheet issue would have basically meant the end of the company immediately. I mean, that's an assessment I made early on." (Drayton Dep. 216:18–20 (Dkt. No. 41-4 at 78).) In his deposition testimony, when asked, "As a CEO, did you ever consider contacting the clients and informing them of the balance sheet problem proactively?" Drayton answered, "No. For exactly the reason I just mentioned," which was that "[a]ny public disclosure of it was going to mean the end of the company[.]" (*Id.* at 217:8–11.) In addition, when Plaintiff initially demanded immediate payment of the owed remittances, Drayton told Plaintiff the problem was related to the "current credit crisis" and assured Plaintiff that CMI would pay Plaintiff 1.5% per month interest on any amounts owed until the remittances were paid in full. (10/6/08 Drayton Email (Dkt. No. 34-5).) Only later, in December 2008, did Drayton tell Plaintiff that the amount of payments that would be forthcoming was uncertain. (12/4/08 Drayton Email (Dkt. No. 39).) At that point, he admitted that in the past, CMI may have made promises that it did not know could be kept. (*Id.*) It appears, therefore, from Drayton's own words, that there is some evidence of dishonesty with respect to CMI's handling of Plaintiff's funds.

On the evidence presented, the Court is not persuaded that the business judgment rule applies here to insulate Drayton from personal liability for decisions made with respect to the handling of Plaintiff's funds.

**2. Unjust Enrichment**

Drayton next cites the fact that a valid contract exists between Plaintiff and CMI as a basis for defeating Plaintiff's unjust enrichment claim against him. (Def.'s Mot. 22 (Dkt. No. 36).) Unjust

ORDER – 9

enrichment may be established where there is "[a] benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 810 P.2d 12, 18 (Wash. Ct. App. 1991). Plaintiff essentially alleges that it conferred a benefit upon Drayton, CMI, and Arena, consisting of the $117,000 in funds that CMI used for operating expenses and to upgrade the Rainier technology, that Drayton knew of this benefit, and that it is inequitable under the circumstances to allow Drayton to retain that benefit without payment of its value to Plaintiff. (Am. Compl. ¶¶ 67–69 (Dkt. No. 26); Pl.'s Resp. 16 (Dkt. No. 49).) Plaintiff asserts that Drayton can be said to have retained a benefit because Rainier Software, Inc., purchased the bankruptcy assets of CMI/Arena for a nominal sum, and Drayton owns approximately 10% of Rainier Software, Inc., and receives an annual salary of $180,000 from that company.

The Washington Supreme Court has described unjust enrichment as "the method of recovery for the value of the benefit retained *absent any contractual relationship* because notions of fairness and justice require it." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008) (emphasis added). As such, Drayton argues that the presence of a valid contract between CMI and Plaintiff pursuant to which CMI is liable to Plaintiff for the unpaid $117,000, precludes an unjust enrichment claim against Drayton for this same amount. (Def.'s Mot. 22 (Dkt. No. 36).)

It is undisputed that Drayton is not a party to the contract between Plaintiff and CMI. Drayton explicitly states that "the agreement is between [CMI] and Montclair. I did not sign the document, nor did I agree to be held personally liable for any breach of this agreement." (Drayton Decl. ¶ 29 (Dkt. No. 37 at 14).) However, it also appears that, under Washington law, an "action to recover a liquidated amount that is due from another on an enforceable contract is not within the theory of unjust enrichment." *Hopkins v. Anderson*, 502 P.2d 473, 476 (Wash. Ct. App. 1972); *cf.* 66 AM. JUR. 2D RESTITUTION AND IMPLIED CONTRACTS § 90 (2009) ("Where work and labor is performed under a

ORDER – 10

contract, suit must be between the parties to the contract; and third persons, although benefited by the work, cannot be sued on an implied assumpsit to pay for that benefit, because an implied undertaking cannot arise, as against one benefited by the work performed, where the work was done under a special contract with other persons.") (*citing Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 103 (Wash. 1943)).

Here, the amount that Plaintiff seeks to recover is the remaining $117,000 in registration funds that Defendant CMI rightfully received pursuant to an enforceable contract with Plaintiff and that CMI did not remit to Plaintiff, allegedly in breach of that agreement. Although Drayton ultimately benefitted from CMI's use of those funds to update the Rainier technology—in that he later became a part owner of Rainier Software, Inc., the company that now owns that asset, and also now derives a salary from that company—that does not change the fact that Plaintiff actually conferred the benefit upon CMI pursuant to an express contract. Therefore, the circumstances here do not present a valid unjust enrichment claim under Washington law against Drayton.

Accordingly, the Court hereby GRANTS Defendant's motion with respect to the unjust enrichment claim.

### 3. Punitive Damages

Finally, Drayton argues that, under Washington law, punitive damages are not available on Plaintiff's claim for tortious interference with a contract. (Def.'s Mot. 23 (Dkt. No. 36).) Plaintiff responds that, under Federal law, punitive damages are available in tort cases where the defendant had actual intent to injure, evil motive, recklessness, serious indifference to or disregard for the rights of others, or gross negligence. (Pl.'s Resp. 22 (Dkt. No. 49 at 26).)

However, this is a diversity case, in which the substantive law of Washington, not Federal law, would apply in determining the availability of punitive damages for a tort claim. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989) ("In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for

ORDER – 11

the conduct in question . . . [is a] question[] of state law.").

"Punitive damages are not allowed in Washington unless specifically authorized by statute." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE § 5.10 (3d ed. 2008) (*citing Dailey v. N. Coast Life Ins. Co.*, 919 P.2d 589, 590 (Wash. 1996)). The Court is not aware of any pertinent Washington statute authorizing punitive damages for tortious interference with contract. Rather, it appears that, under Washington law, a prevailing plaintiff on a claim for intentional interference with contractual relations may be entitled only to damages to compensate it for the financial loss of the benefits of the contract; monetary damages from mental distress, discomfort, inconvenience, injury to reputation, and humiliation; and consequential damages. 16A DEWOLF & ALLEN, *supra* § 22.6; *see also* 6A WASH. PRAC., WASHINGTON PATTERN JURY INSTRUCTIONS—CIVIL WPI 352.01 (5th ed. 2009).

Accordingly, the Court GRANTS Defendant's motion with respect to this issue.

**B.     Plaintiff's Motion for Summary Judgment**

The Court now turns to Plaintiff's motion. Plaintiff seeks summary judgment on its claims for conversion, unjust enrichment,[5] and deceptive trade practices based on Washington's "responsible corporate officer" doctrine.

Under Washington law, "[i]f a corporate officer participates in [] wrongful conduct, or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable for the penalties." *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 553 P.2d 423, 439 (Wash. 1976) (*citing Johnson v. Harrigan-Peach Land Dev. Co.*, 489 P.2d 923, 928 (Wash. 1971) (explaining that "an officer of a corporation who takes no part whatever in a tort committed by the corporation is not personally liable to third persons for such tort but, . . . this immunity vanishes if such corporate officer knowingly participated in, cooperated in the doing of, or directed that the acts be done.")). This rule is

---

[5]For the reasons discussed in Section III.A.2 above, the Court grants summary judgment to Drayton on the issue of unjust enrichment. Accordingly, the Court does not address Plaintiff's motion with respect to this issue.

ORDER – 12

known as the "responsible corporate officer" doctrine. *State Dep't of Ecology v. Lundgren*, 971 P.2d 948, 952 (Wash. Ct. App. 1999). It is distinct from piercing the corporate veil on an alter ego theory, which applies when the corporate entity has been so disregarded by the corporate officer that there is a unity of ownership and interest, which causes the separate personhood to cease to exist. *See Grayson v. Nordic Constr. Co., Inc.*, 599 P.2d 1271, 1274 (Wash. 1979) (attributing liability to an officer of a corporation under the responsible corporate officer doctrine notwithstanding the fact that veil piercing was inappropriate).

It appears that Washington courts have applied the responsible corporate officer doctrine in holding officers liable for the same causes of action as those presented in Plaintiff's motion for summary judgment: for deceptive trade practices, *see Ralph Williams*, 553 P.2d at 439 (holding a responsible corporate officer liable for deceptive trade practices of a car dealership where the officer formulated and supervised the dealership's unlawful activities); for conversion, *see Dodson v. Economy Equip. Co.*, 62 P.2d 708, 709 (Wash. 1936) ("Where the officer performs an act or a series of acts which would amount to conversion if he acted for himself alone, he is personally liable even though the acts were performed for the benefit of his principal and without profit to himself personally"); and for unjust enrichment, *see Betchard-Clayton, Inc. v. King*, 707 P.2d 1361, 1365–66 (Wash. Ct. App. 1985) (imposing a constructive trust upon the sole owners of a corporation personally, requiring that they return a down payment to a third party to prevent unjust enrichment after the failure of a contract).

In theory, then, Drayton may be held personally liable for conversion and deceptive trade practices of CMI/Arena so long as he participated in the wrongful conduct, or, with knowledge, approved of the conduct. The Court must therefore determine whether Plaintiff is entitled to summary judgment on these claims.

To prove that Drayton should be held liable for conversion based on CMI's use of Plaintiff's funds to develop the Rainier software and to pay other operating expenses, Plaintiff must show that: (1) CMI converted Plaintiff's funds, and (2) Drayton participated in CMI's conversion of Plaintiff's funds,

ORDER – 13

or, with knowledge, approved of that conduct. *See Consulting Overseas Mgmt, Ltd. v. Shtikel*, 18 P.3d 1144, 1147 (Wash. Ct. App. 2001) (finding that because the company did not commit the tort of conversion in handling loan proceeds, its corporate officers could not be held personally liable even though it was undisputed that they participated in the decision-making in handling those loan proceeds).

However, the instant case is subject to an automatic stay as to Defendant CMI because of pending bankruptcy proceedings in this district. (Mot. to Am. Compl. (Dkt. No. 21).) The Court would violate the stay by considering issues presented by or related to the stayed case as to CMI. *See, e.g.*, *Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 756 (9th Cir. 1995) (stating that even "thinking about the issues violates the stay"). As such, the Court cannot at this time consider whether CMI did, in fact, commit the tort of conversion—as Plaintiff has alleged in its Amended Complaint—in order to decide whether Plaintiff is personally liable for participating in such conduct, or knowingly approved of it. "In this circuit, actions taken in violation of the automatic stay are void[.]" *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F.2d 581, 586 (9th Cir. 1993). Accordingly, the Court must decline to consider this issue at present.

For the same reasons, the Court cannot at this time pass on whether CMI violated Washington's Consumer Protection Act, the first step in determining whether Drayton can be held personally liable for participating in that alleged violation or knowingly approving of such conduct. Accordingly, the Court must at this time DENY without prejudice Plaintiff's motion as to these issues.

**IV.   CONCLUSION**

For the foregoing reasons, the Court hereby DENIES WITHOUT PREJUDICE Plaintiff's Amended Motion for Summary Judgment (Dkt. No. 45) and GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment (Dkt. No. 36). The parties are DIRECTED to submit a joint status update to the Court, by September 24, 2009, discussing the appropriateness of maintaining

//

//

ORDER – 14

the currently scheduled trial date of October 5, 2009, given the matters discussed herein.

DATED this 14th day of September, 2009.

_____
John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 15