THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MONTCLAIR UNITED SOCCER CLUB, | Case No. C08-1642-JCC |
| Plaintiff, | ORDER |
| v. | |
| COUNT ME IN CORP., ARENA GROUP, INC., and J. TERRENCE DRAYTON, | |
| Defendants. | |

This matter comes before the Court on Plaintiff's renewed motion for summary judgment (Dkt. No. 70), Defendants' response (Dkt. No. 73), and Plaintiff's reply. (Dkt. No. 80.) Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion IN PART for the reasons explained herein.

I.  BACKGROUND

The facts of this case were set out at length in the Court's previous Order (Dkt. No. 61), but will be repeated here for the sake of completeness. Plaintiff Montclair United Soccer Club is a non-profit organization that sponsors recreational and competitive soccer programs for

ORDER
PAGE - 1

1  more than 1600 children from Montclair, New Jersey, and surrounding communities. (Heisler
2  Decl. ¶ 1 (Dkt. No. 71).) Plaintiff also sponsors soccer programs for children with special
3  needs and programs for the benefit of local parks and schools. (*Id*. at 1–2.) The organization is
4  funded solely through registration fees and donations made on behalf of the children who
5  participate in its programs. (*Id*. at 2.)

6  Defendant Count Me In Corporation ("CMI"), a Washington company based in
7  Bellevue, describes itself as "the trusted online sports registration software for thousands of
8  organizations, tens of thousands of activities, millions of registrations and hundreds of millions
9  in payments." (Am. Compl. ¶ 10 (Dkt. No. 26).) On February 23, 2007, Montclair entered a
10 Client Service Agreement with CMI pursuant to which CMI was to provide Montclair with
11 online registration and payment services. (Client Service Agreement (Dkt. No. 72-3).) The
12 Client Service Agreement required CMI to provide online registration and credit card payment
13 processing services in exchange for transaction fees paid by Montclair. (Am. Compl. ¶ 12 (Dkt.
14 No. 26).) CMI collected registration fees from Montclair's registrants and was required, under
15 the Client Service Agreement, to remit the fees, minus the agreed-upon transaction fees, to
16 Montclair twice per month. (*Id*. ¶ 14.)

17 During the spring, summer, and fall of 2008, Montclair's registrants paid more than
18 $210,000 in fees and donations to Montclair using CMI's website. (*Id*. ¶ 15.) However, the
19 remittances from CMI were not forthcoming. When Montclair's directors contacted CMI to
20 inquire about the funds, they received responses from CMI's Chief Executive Officer,
21 Defendant J. Terrence Drayton. On October 6, 2008, in response to an email from one of
22 Montclair's directors asking for payment, Drayton sent a reply email stating, in pertinent part:

23 > These are challenging times and like many firms in the current credit crisis we
> are having cash flow problems. We have stabilized the situation and are
24 > working to address it as quickly as possible with a capital infusion. We are
> doing our best to get you the funds and will pay you as soon as we possibly can.
25 > We are addressing all client remittances on a systematic basis and will remit the
> outstanding payments for Cycle's [sic] 13 through 15 that total $67,326.70
26 > Thursday or worst case on Friday of this week. That will get Montclair United

ORDER
PAGE - 2

>current to mid-August. We will also pay you the interest of 1.5% per month on any amounts we owe you until it is paid in full. . . .
>Sincerely, Terry Drayton
>Founder & CEO

(10/6/08 Drayton Email (Dkt. No. 72-4 at 1).) The following day, Drayton sent a company-wide email discussing CMI's remittance problems, in which Drayton explained that CMI's client funds and its own company funds had been commingled, and that client funds had paid for CMI's operating expenses. (Heisler Decl. ¶ 6 (Dkt. No. 71).) In particular, client funds had been spent developing a software program called Rainier. (*Id*.) The email further explained that in order to remain a high repayment priority, clients would have to continue to do business with CMI. (*Id.*) Although CMI eventually paid some of the owed remittances to Montclair, approximately $117,000 still remains unpaid. (*Id.* ¶ 9.)

On November 10, 2008, Plaintiff initiated this action, bringing claims against CMI for breach of contract, breach of good faith and fair dealing, unfair and deceptive trade practices in violation of the Washington Consumer Protection Act ("CPA"), conversion, and unjust enrichment. (Compl. (Dkt. No. 1).) The Complaint also included conversion and unjust enrichment claims against Defendant Arena Group, Inc. ("Arena"), CMI's parent company. (*Id*.) At that time, Plaintiff made only one allegation against Drayton personally—that he had engaged in tortious interference with the Client Service Agreement. (*Id*.) Thereafter, however, this matter was stayed as to CMI and Arena pending resolution of Chapter 7 Bankruptcy proceedings in this district. (Mot. to Am. Compl. (Dkt. No. 21).) As a result, Plaintiff amended its Complaint to add claims against Drayton, including breach of contract, breach of good faith and fair dealing, violation of Washington's CPA, conversion, and unjust enrichment. (Am. Compl. (Dkt. No. 26).) In addition, the Amended Complaint adds a claim against Drayton for

ORDER
PAGE - 3

fraudulent transfer of assets, based on Drayton's alleged transfer of property to his wife soon after the initiation of this lawsuit. (*Id.*)

On or around April 30, 2009, Rainier Software, Inc. purchased CMI and Arena Group's assets, including the Rainier software program, which was upgraded with client money. (Mot. 7–8 (Dkt. No. 70).) Drayton maintains an ownership stake in Rainier Software, Inc., and receives an annual salary of $180,000. (Drayton Dep. 139:15-20 (Dkt. No. 72-23).)

In July 2009, Drayton moved for summary judgment on the grounds that he was shielded from liability by the business judgment rule. (Dkt. No. 36.) Plaintiff then moved for summary judgment against Defendant Drayton personally, on its claims for conversion, unjust enrichment, and deceptive trade practices. (Dkt. No. 45.) On September 14, 2009, the Court issued an order highlighting concerns about Drayton's honesty and denying his motion. (Dkt. No. 61 at 9.) The Court could not consider Drayton's personal liability for the underlying acts, however, because of the automatic stay as to Defendant CMI, and denied Montclair's motion without prejudice. (*Id.* at 14.)

On January 11, 2010, the Bankruptcy Court granted Plaintiff's request for relief from the stay so that this Court could address Plaintiff's claims against Defendant Drayton. (Mot. 8 (Dkt. No. 70).) Plaintiff now seeks summary judgment on its claims against Drayton for conversion and deceptive trade practices based on Washington's Responsible Corporate Officer doctrine.

## II.     APPLICABLE LAW

Summary judgment is appropriate if, after viewing the evidence in the light most favorable to the nonmoving party, the Court determines there are no genuine issues of material fact. Fed. R. Civ. P. 56(c)(2). There is no genuine issue of fact for a trial where the record,

taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court must inquire into "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is in fact a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

## III.   DISCUSSION

### A. Personal Liability

Before deciding which, if any, of the allegations of misconduct Drayton participated in, the Court must determine the issue of his liability. Drayton claims that he cannot be held liable for any of his actions as CEO of CMI because he is protected by the business judgment rule. Montclair claims that Washington law creates personal liability under the responsible corporate officer doctrine. The Court will evaluate these claims before proceeding to the individual alleged acts.

#### 1. Business Judgment Rule

In Washington, "a court will not substitute its judgment for that of corporate directors '[u]nless there is evidence of fraud, dishonesty, or incompetence (i.e., failure to exercise proper care, skill, and diligence)[.]'" *Riss v. Angel*, 934 P.2d 669, 681 (Wash. 1997). To secure the protection of the business judgment rule, "[g]ood faith is insufficient because a director must also act with such care as a reasonably prudent person in a like position would use under similar circumstances." *Id.*; *see also Shinn v. Thrust IV, Inc.*, 786 P.2d 285, 290 (Wash. Ct.

App. 1990) (holding that to be protected by the business judgment rule a director must act with good faith and with such care as an ordinarily prudent person in a like position would use under similar circumstances).

In the order denying Drayton's motion for summary judgment on the basis of the business judgment rule, the Court concluded that Drayton had not sufficiently established his honesty and good faith to warrant summary judgment. (Order 5–9 (Dkt. No. 61).) As Drayton correctly points out, denial of summary judgment under those circumstances is not tantamount to a finding in the present motion that he did not act with reasonable care. (Resp. 17 (Dkt. No. 73).) This is not to say, however, that the Court *did* find a genuine issue of material fact to support Drayton's claims of reasonable care, merely that such a determination was not yet appropriate.

Revisiting its order, the Court concludes that Drayton indeed failed to demonstrate a genuine issue of material fact as to whether he should be entitled to the protection of the business judgment rule. *See Matsushita*, 475 U.S. at 586. No new facts have emerged since the Court issued its previous order. No reasonable finder of fact could determine that Drayton acted reasonably when he: a) combined client and company money without adequate accounting systems in place, b) failed to disclose to clients what had happened to their money, and c) used that money to develop a profitable software program.

**2. Responsible Corporate Officer Doctrine**

The Court's prior Order also examined the Responsible Corporate Officer Doctrine and concluded that in theory, Drayton may be held personally liable for conversion and deceptive trade practices of CMI/Arena so long as he participated in the wrongful conduct, or with knowledge approved of the conduct. (Order 12–13 (Dkt. No. 61).) The Court must therefore determine whether Montclair is entitled to summary judgment on these claims.

ORDER
PAGE - 6

**B. Alleged Misconduct**

**1. Conversion**

"The tort of conversion is 'the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it.'" *Id.* at 1147 (*quoting Wash. State Bank v. Medalia Healthcare LLC*, 984 P.2d 1041 (Wash. Ct. App. 1999)). In addition, "[m]oney may become the subject of conversion, but only if the party charged with conversion wrongfully received the money, or if that party had an obligation to return the money to the party claiming it." *Id.* (citations omitted); *see also Maynard Inv. Co. v. McCann*, 465 P.2d 657, 624 (Wash. 1970) (holding that where a plaintiff's funds given to a construction contractor for use in paying for labor and materialmen on a remodeling project were used to pay off the construction contractor's creditors instead, such misuse of funds constituted conversion).

To prove that Drayton should be held liable for conversion based on CMI's use of Montclair's funds to develop the Rainier software and to pay other operating expenses, Montclair must show that: (1) CMI converted Montclair's funds, and (2) Drayton participated in CMI's conversion of Montclair's funds, or with knowledge approved of that conduct. *See Consulting Overseas Mgmt, Ltd. v. Shtikel*, 18 P.3d 1144, 1147 (Wash. Ct. App. 2001)

Here, CMI had a contractual obligation to return to Montclair the funds that Montclair's registrants paid using CMI's website. Drayton argues that the funds were, in fact, owned by CMI in the same way that a borrower owns loan proceeds, and that, therefore, CMI cannot be held liable for conversion. (Resp. 7 (Dkt. No. 73).) He cites *Consulting Overseas Management*, in which the court held that a company's use of certain corporate loan proceeds for a different purpose than that stated in the loan agreement did not constitute conversion. 18 P.3d at 1147. The court based its decision on the fact that, under Washington law, upon signing a loan agreement and the disbursal of those funds, the borrower is deemed to "own" the loan proceeds. *Id.* at 1147–48.

ORDER
PAGE - 7

This case is distinguishable from *Consulting Overseas Management*. The funds at issue did not constitute a loan. Rather, the Client Service Agreement expressly referred to the registration fees collected through CMI's website as "Client fees"—that is, belonging to the client, Montclair United Soccer Club. (Client Service Agreement ¶ 6 (Dkt. No. 72-3 at 1).) "Client fees, donations and sales taxes collected online, less applicable CMI fees and payment processing charges" were to be "remitted to Client twice per month in arrears." (*Id*.) Nothing in the parties' agreement indicates that the Client funds were to be used by CMI for any purpose whatsoever. The only portion of the collected funds that belonged to CMI was the applicable transaction fees and payment processing charges. Accordingly, CMI's use of "Client fees, donations and sales taxes collected online" that expressly belonged to Montclair constitutes conversion.

Drayton argues that he was not personally involved in CMI's conversion of Montclair's funds. (Def.'s Resp. 5–6 (Dkt. No. 73).) Specifically, he argues that he never handled the remittance funds and "never instructed anyone to convert Montclair's funds with the intention of permanently depriving any clients." (*Id*.) The uncontroverted evidence belies his claim:

> A small portion of funds for all [CMI] clients was withheld so we could continue operating as we tried to find investors and prospective purchasers. . . . [CMI] was faced with the question of whether to use funds to operate while it was trying to sell part or all of its business or, instead, to use 100% of funds available to pay remittances to clients. [CMI] was supposed to pay Arena fees to reimburse overhead so if we used everything to pay remittances to clients, we would be forced to shut down because of our inability to pay operating expenses. If we were to shut down, it would be a nearly impossible task to attract investors or potential purchasers of the business. It was necessary to keep the company operational and continue servicing current clients while we sought funding. . . .

(Drayton Decl. ¶ 46 (Dkt. No. 74 at 22–23).) For another example, in an October 9, 2008, email, Drayton explains to one of Montclair's directors that "we"—meaning Drayton and others at CMI—were paying the oldest amounts owed to clients first and that Montclair would therefore have to wait to receive its full remittances. (10/9/08 Email (Dkt. No. 72-5 at 1).) This indicates that Drayton participated in, and with knowledge, approved of CMI's unauthorized

use of Montclair's property. Further, Drayton testified that he decided not to disclose the company's accounting problems: "[t]o disclose the balance sheet issue would have basically meant the end of the company immediately. I mean, that's an assessment I made early on." (Drayton Dep. 216:18–20 (Dkt. No. 72–23 at 79).) The Court is persuaded that Drayton participated in or knew about CMI's conversion of Montclair's funds, such that he is personally liable to Montclair for conversion. Accordingly, Montclair's motion for summary judgment is GRANTED with respect to its claims for conversion.

**2. Deceptive Trade Practices**

In order to prevail in a private Consumer Protection Act claim, a plaintiff must establish five elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation. *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986).

Montclair identifies three practices that, it claims, were unfair and deceptive: Drayton's "Ponzi scheme," his refusal to be forthcoming to clients about balance sheet issues, and advertisements about "safe and secure" credit card processing. (Mot. 19 (Dkt. No. 70).) Montclair supports this argument with nothing more than conclusory statements, however, and the Court is not convinced. The Court finds that Montclair has failed to meet its burden on summary judgment with respect to its CPA claim. Accordingly, Montclair's motion for summary judgment is DENIED with respect to its claims for deceptive trade practices.

//
//
//

ORDER
PAGE - 9

## IV. CONCLUSION

For the foregoing reasons, Montclair's Motion for Summary Judgment (Dkt. No. 70) is GRANTED in PART and DENIED in PART.

DATED this 9th day of June, 2010.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 10